IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 SEP -8  AM 8: 33

U.S. DISTRICT  COURT
N D. OF ALABAMA

PATRICIA STOKES, )
)
     Petitioner )
)
vs. )    CASE NO. CV03-P-3309-S
)
TERRY SURLES and THE ATTORNEY )
GENERAL OF THE STATE OF ALABAMA, )
)
     Respondents )

**ENTERED**

SEP - 8 2004

## MEMORANDUM OPINION

Petitioner, Patricia Stokes, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. She challenges the validity of her 2002 conviction in the Circuit Court of St. Clair County, Alabama, on a charge of causing serious physical injury to a protected person as a result of abuse or neglect, in violation of § 38-9-7, *Ala. Code* (1977).

### INTRODUCTION

Petitioner, who was charged, tried, and convicted along with her husband, Ottie Stokes, appealed her conviction to the Alabama Court of Criminal Appeals. She was sentenced on August 20, 2002, to a term of ten years, split, with three of those years to be served in custody. The conviction was affirmed by memorandum opinion dated June 20,

2003. (Exhibit C).[1] Rehearing was denied (Exhibit E), and the Alabama Supreme Court denied a petition for a writ of certiorari on November 7, 2003. (Exhibit F).

Petitioner filed this petition for writ of habeas corpus on December 15, 2003. Respondents concede that she has exhausted the claims raised in Issues 1, 3, 4, and 5 by obtaining a complete review of the contentions in the state appellate courts. (Doc. #3, Answer of Respondents, at 5-6). Respondents also concede that the petition is timely under the one-year statute of limitations set out in 28 U.S.C. § 2244(d)(1). (*Id.* at 6-7). Respondents do not address Petitioner's claim that constitutional error resulted from the denial of her motion for a bill of particulars. The motion for a more definite statement and for a bill of particulars were alternative parts of the same motion. (Exhibit A at 16). Although Petitioner's claim regarding her motion for a more definite statement was addressed by the Rule 32 appellate court and Respondents, both failed to address Petitioner's claim that she also was entitled to a bill of particulars. This issue was raised on appeal by Petitioner. (Exhibit B, Brief of Appellant, at 35-36). Thus, it is exhausted. The failure of the state appellate court to address this issue is presumed to be a denial on the merits.

Petitioner raises the following grounds for relief in this petition:

1.    The trial court should have required the State to provide a more definite statement of the indictment;

2.    The trial court erroneously refused to grant the Petitioner's motion for a bill of particulars;

---

[1] The exhibits referenced in this Memorandum Opinion were submitted with Doc. #3, Answer of Respondents.

3.     The State was permitted to engage in a "generic prosecution";

4.     The State failed to prove the victim, Lois Smith, suffered a "serious physical injury"; and

5.     The State failed to establish a *prima facie* case to prove she intentionally abused or neglected Lois Smith.

(Doc. #1, Petition for Writ of Habeas Corpus).

The trial testimony, as recited by the Alabama Court of Criminal Appeals, reflects as follows:

Susan DeShazer, an adult protective services agent for the Alabama Department of Human Resources("DHR"), and Mark Johnson, a Pell City police officer, testified to the following at trial: On April 24, 2001, they visited the victim's home in response to a report of suspected neglect that DHR had received from a home-health agency. DeShazer requested that a police officer accompany her to the victim's home because, she said, on a 1998 visit to the victim's home, Ottie had exhibited violent and abusive behavior toward her. When DeShazer and Johnson stopped in front of the victim's home, they were immediately confronted by Ottie who came from the laundromat located across the street from the victim's home. Ottie told them that they did not have any business being there and that they should leave because, in his opinion, there was no need for them to see the victim.

The door to the victim's home was padlocked from the outside and it did not appear to either DeShazer or Johnson that the victim could have unlocked the door from the inside to come outside. When Johnson asked Ottie if he had a key to the padlock, Ottie told Johnson that "he was the only one with the key and it was in his pocket." (R. 95.) Johnson told Ottie that they were going to gain access to the home "us[ing] whatever means necessary to get into the house to check on [the] person [inside]," including "kick[ing] the door in if [Ottie] did not open it." (R. 95.) Ottie pulled some keys out of his pocket, unlocked

3

.

the padlock, removed it, and allowed them to enter the victim's home.

After unlocking the padlock, Ottie went to get Patricia and they returned to the victim's home. Both Ottie and Patricia repeatedly stated to DeShazer that "there was nothing wrong with the care that they were giving [the victim]." (R. 45.)

When asked to describe what she observed when she entered the victim's home, DeShazer stated:

> "When I entered the home and went into the bedroom I found [the victim] laying on a bed with a dirty bed sheet. And she was laying directly on top of a deflated air mattress, a yellow deflated air mattress, the type you would blow up in a swimming pool, to lay on in a swimming pool or in the lake. It was deflated and she was laying on that. She was propped up by a metal kitchenette/dinette chair that was turned over so that she was propped up on the back of the chair. She had no pillow behind her. There was some type of a dirty rug or covering. More like a covering, maybe, over that part of the chair.

> "She, herself, was dressed and her lower extremities, except for her feet, were covered with old dirty bathroom mats, rubber backed. The rubber backing side was on her body."

(R. 43.). DeShazer testified that the victim was "extremely, extremely thin," that "the skin on [the victim] was just loose and hanging she was so emaciated," that the victim "was dirty" and her hair was disheveled," and that "there were some roaches in the bed around [the victim]." When DeShazer loosened the victim's diaper, she found "a decubitus ulcer approximately two to three inches wide and deep enough that [DeShazer] could see the tendons in [the victim's] hip area" (R.47) and that there was no dressing of any kind on this wound.

4

When asked to describe the condition of the victim's home, DeShazer stated that in addition to the front door being padlocked shut, which denied the victim outside access, there was no running water inside the home, and in fact, the only water was in milk jugs located on the front porch of the victim's home; the phone lines did not work; the lights in the bedroom and kitchen area did not work and the only light in the victim's home was "a bare hall light hanging down" (R. 81); the refrigerator was turned off; there was no edible food, water or other liquids inside the house; there was a disconnected heater; the bathroom was roped shut; and the kitchen floor had rotted in places -- there was a hole in the kitchen floor and the floor was "falling in." (R. 52).

The victim was transported to Brookwood Hospital where Dr. Paul Roller admitted her to the geriatric unit of the hospital. Dr. Roller's initial physical exam of the victim revealed "a frail older woman" who "looked to be dehydrated" (R. 171); that they "thought that she probably had pneumonia based on the chest X-ray and [that she] potentially had a urinary tract infection" (R. 206); and that she had "a decubitus ulcer on her hip which looked like it had been there for quite some time" (R. 171) because the ulcer was "a stage III or IV" which "doesn't occur overnight." (R. 174.) Dr. Roller also testified that a decubitus ulcer is "commonly called a bedsore." (R. 183.) When asked what is the proper treatment for a decubitus ulcer, Dr. Roller stated:

> "Most of the time what we want to do is to [debride] the ulcer, meaning we would get all of the dead tissue out of that ulcer first. Keep it as clean as possible is the best way, and relieving the pressure is the only way to cure it. Meaning you have to turn the person every two hours or put them on a special type of mattress. And then dressing the wound to protect it from outside insult and other infection."

(R. 174.) Dr. Roller testified that if untreated for an extended period of time, a decubitus ulcer could result in death.

During his cross-examination of Dr. Roller, Ottie's attorney questioned Dr. Roller concerning his knowledge of any medical treatment the victim may have received prior to her removal from her home on April 24, 2001. During cross-examination, Dr. Roller stated that he "[did] not know that" (R. 196) the victim had seen Sue Suggs, a nurse practitioner at Main Street Medical Clinic, on April 16, 2001, eight days before she was removed from her home. Pursuant to the request of Ottie's attorney, Dr. Roller read aloud to the jury the April 16, 2001, office note, which stated, in pertinent part:

> "Left hip with large decubitus. Foul smelling odor to and green tissue. Tissue debrided, saline 4 by 4's packed and wound covered by 4 x 4's. Daughter educated to keep [the] wound clean and dry. Home health care will be out to evaluate patient, providing home health services. Patient agreed with plan, patient's daughter agreed with plan."

(R. 197-98.) Dr. Roller agreed that this was "a reasonable way to deal with [the decubitus ulcer]." (R. 198.)

After the victim's April 16, 2001, visit with Suggs, Alacare, a home-health agency, sent a nurse out to the victim's home to treat the victim's decubitus ulcer. The home-health nurse came out for a couple of days and then was denied entrance to the victim's home – the home-health agency reported to DHR that Patricia "blocked the door and said, 'We are going to treat this ourselves, we don't need you any more.'" (R. 61.) During his testimony Ottie admitted that "after two or three days" Patricia told Alacare that "she didn't need them anymore" because "they wasn't doing nothing for [the victim]" and that she "was going to carry [the victim] back to her regular doctor." (R. 282.)

On April 24, 2001, the victim saw Dr. James Matic, a family physician, who noted that the victim's "[l]eft hip on lateral side has decubitus involving subcutaneous tissue and muscles but not bone." (R. 200.) Dr. Matic's April 24, 2001,

6

note also stated, "Options discussed with daughter. I recommend nursing home placement. The daughter will prefer to try home health treatment first. We will recheck in one month." (R. 200.)

Dr. Matic testified that his "recommendation was nursing home [placement] so that [the victim] could have constant twenty-four hour care . . . because those kind of ulcers . . . need to be turned regularly . . . to avoid pressure." (R. 253.) He also testified that "they talked about options and [Patricia] wanted to try home [health] treatment first" (R. 252), but that he "didn't know at the time" -- when he saw the victim on April 24, 2001, -- that "home health had already been out [to the victim's home to help care for her decubitus ulcer] and had already reported to [DHR] that [the victim] needed to be looked in on for suspicion of abuse." (R. 254.) When shown the photograph taken on April 24, 2001, of the victim as she was found laying on the deflated air mattress and propped up on an overturned chair, Dr. Matic stated that it did not appear to him that the pressure was off her bedsore and that while "sometimes you have to lie down and still press on the sore . . . most of the time you have to keep the pressure off." (R. 256.)

(Exhibit C, Memorandum Opinion, at 10-13).

<u>**DISCUSSION**</u>

**<u>Petitioner's Claims That the Trial Court Should Have Required the State to Provide a More Definite Statement of the Indictment, and that the Trial Court Erroneously Refused to Grant the Petitioner's Motion for a Bill of Particulars</u>**.

Respondents assert that Stokes is barred from asserting her first ground for relief--that the trial court should have required the State to provide a more definite statement of the indictment–because the state courts concluded that Stokes failed to timely raise the claim in accordance with Rule 13.2(e) of the Alabama Rules of Criminal Procedure. (Doc. #3, Answer of Respondents, at 8-10).

The indictment under which Petitioner was prosecuted, filed September 25, 2001, states the charges as follows:

> The Grand Jury of said County charges that before the finding of this Indictment,

### Count 1

> PATRICIA STOKES, whose name is otherwise unknown to the Grand Jury, did intentionally abuse or neglect a protected person, to wit:  LOIS SMITH, and thereby caused serious physical injury to the said LOIS SMITH in violation of 38-9-7 of the Code of Alabama

### Count 2

> PATRICIA STOKES, whose name is otherwise unknown to the Grand Jury, did recklessly abuse or neglect a protected person, to wit:  LOIS SMITH, and thereby caused serious physical injury to the said LOIS SMITH in violation of 38-9-7 of the Code of Alabama

> contrary to law aginst [*sic*] the peace and dignity of the State of Alabama.

(Exhibit A at 7).

On October 19, 2001, Stokes, represented by attorney William Dawson, waived arraignment and entered a plea of not guilty.  (*Id*. at 15).  Petitioner submitted a written waiver of arraignment on a Form CR-9 supplied by the State of Alabama Unified Judicial System.  In addition to entering a written plea of not guilty thereon, the form further provides as follows:

> Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an

arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant *specifically and expressly reserves the right upon the filing hereof* to hereafter, but before trial or before such date as may be set by the court, *to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.*

(*Id.* (emphasis added)).

On February 15, 2002, James McInturff entered a notice of appearance for Patricia Stokes. (*Id.* at 26). On February 20, 2002, Stokes filed a motion for a bill of particulars, for a more definite statement or, in the alternative, a motion to dismiss the indictment. (*Id.* at 16). She alleged therein as follows:

1. That the indictment is unconstitutionally vague, failing to provide any specific information as to dates, times, places, or any other information which gives any indication of what this defendant is charged with. The said indictment fails to provide adequate notice to distinguish between lawful and unlawful conduct.

2. Defendant has not been informed of what she is to defend against or what the gravamen of the said indictment might be.

3. A more definite statement is necessary if defendant is to be protected against double jeopardy or principals [*sic*] of collateral estoppel.

4. The vague nature of the indictment fails to provide sufficient information to test the constitutionality of the charges.

5. For the foregoing reasons, the said indictment as presented is unconstitutional and unlawful.

(*Id.*).

9

On the same date, Petitioner filed a separate motion to dismiss the indictment, alleging that it was unconstitutionally vague, failed to provide adequate notice of the alleged violation of law, and failed to provide sufficient information to define prohibited conduct. (*Id.* at 17). St. Clair County Circuit Court Judge William Hereford denied the motions without comment on March 6, 2002. (*Id.* at 3). These issues were raised again by counsel for both Petitioner and her husband immediately prior to trial on June 26, 2002. At that time, the following exchange occurred:

> (In chambers.)
>
> THE COURT:        Let's hear your motion.
>
> MR. DAWSON:        Judge, we have two motions which we had filed some time ago. Basically they are attacking two things; the statutory scheme, and more particularly, the indictment. We have filed a motion to dismiss for the failure to provide any particularity as to what we are to defend. And in the alternative we have filed a motion for a Bill of Particulars or certainly for a More Definite Statement. What these two defendants are charged with is just intentionally or recklessly abusing or neglecting a protected person, Lois Smith. It doesn't say the means of it, how the crime was allegedly committed or not committed. It alleges these two things even in the alternative; intentionally and recklessly. We think we are entitled to know before we go to trial, for reasons of double jeopardy and due process, to know exactly what it is that these people are charged with doing. Whether it is a failure to feed somebody, to bathe them, to watch after them, to keep them from falling down or anything like that. And we think it puts a real burden and it denies us a fair trial being unable to know what it is, exactly, that they are focusing on, what the focus of this offense is. And they have not filed any kind of responsive pleadings to say what they did or they could have amended this indictment. So in the statute, of course it does cover the

statutory form of a very vague and nebulous indictment, and we think that both the statute is void for vagueness and doesn't give sufficient notice, as well as the indictment.

And before we would be required to stand trial on a Class B or Class C felony we should at least know exactly what we are to defend or what the jury is going to be told they may consider as constituting a crime. They may just decide anything they want to is a crime. There are no parameters here. We would ask for appropriate relief or dismissal of this.

THE COURT:        All right, sir. Glad to hear from the State.

MR. DAVIS:        Judge, the State in returning this indictment tracked the statute and that is the only thing we can do. Had we added a lot of stuff to it I'm sure we would be here on a motion involving surpluses or anything. I can tell Mr. Dawson that our case, the State's case in this case, I respond all of the above to the things he mentioned that we expect to prove in the way of neglect will be brought out in the trial. If the court directs us to we can tell him what our evidence is going to be. I think he already knows it is going to involve several different matters of intentional and reckless abuse and neglect. We have professional expert witnesses coming in to testify on those issues.

But, basically, in the indictment that was returned we tracked the statute that was provided to us.

THE COURT:        Well I know you did that, Van, because I have looked at the indictment and the statute as well. And certainly I think the motions are appropriate and by no means frivolous. I'm going to deny them. But I think not making them would -- in other words, I'm glad you made them. I have looked at it and it appears that it tracks the statute and it satisfies the law as far as I am concerned. But to say that I don't appreciate your concerns would be wrong. I'm going to deny the motion, though.

11

MR. DAWSON:     One last thing.

THE COURT:     Sure.

MR. DAWSON:     How would we know or the jury know exactly what may be actionable conduct or not?  It is just sort of left to the imagination.

MR. WILLIAMSON:     It is defined in the Code, the section under which the Stokes are indicted.  It has a definition of both abuse and neglect.

THE COURT:     Like I say, I'm satisfied that it meets the minimum standards.  But what I'm trying to say to you, Bill, is that I appreciate what you're saying and the gravity of the issues that you are raising.  I have considered them and I am going to deny the motion.  But I understand where you are coming from.

MR. DAWSON:     And one last thing I think is included in there.

THE COURT:     Even though I have denied them twice, go ahead.

MR. DAWSON:     As far as the defendant Ottie Stokes, there is no blood relationship here.  There is no relationship that the law would recognize where he has undertaken or been placed in a position of having a legal duty, you know.  And I would submit that I doubt that you could hold just a collateral relative liable under some tort law theory of duty and negligence, you know, where he happens to be married to somebody that is kin to Lois Smith.  And that being said, it certainly would be stretching it to have him charged and answerable in a criminal court where there is not that element of duty set out as to what it is or the jury told as to why there is duty.  And this statute is vague, certainly in so far as he is concerned.  There is no duty that the law would recognize or impose on him or any other person for somebody who they are not in that relation, sufficient relationship to.

THE COURT:      Well, your motion, and I will separate them, your motion is denied. And, Jim, you haven't had much to say. Do you want to add anything to any of this?

MR. McINTURFF:  Yes, sir, just the fact, Judge, that we would adopt Mr. Dawson's motion on behalf of Patricia Stokes, my client. And we would briefly add that we think the statute is not only vague but overbroad, Judge. There's no particular specificity to it. And not only does it encompass an abundance, but it could encompass and be inferred by a jury or the trier of fact an abundance of conduct which has not been spelled out for us. And, Judge, we will note in a murder case that you must say that he was killed with a revolver or a shotgun or by shooting, and the same thing with manslaughter. This doesn't spell anything out, as far as the indictment goes, and we would respectfully ask the Court --

THE COURT:      Excuse me, just a minute.

(Brief recess.)

MR. McINTURFF:  If we could ask the court to order the prosecution to choose which count they are actually going to present this evidence. It gives them two bites at the apple, one reckless and one intentional, and it leaves the jury possibly to infer - and I would say more probably than possibly - say, well we will go ahead and compromise our verdict. We won't find them guilty of any intentional act thinking that a negligent act would be less severe punishment. I believe that the counts provide alternatives in that there are two counts and it gives them two shots at our clients, Judge. We would ask the court to respectfully order the District Attorney's office to choose which count they are going to try.

MR. DAWSON:     We would join in that also.

THE COURT:      I know you do. Your motion is denied, again, and let's go out here and try this thing.

(Exhibit A, R. 4-10).[2]

Following two days of trial, the jury convicted Petitioner (and her husband) of intentional abuse as charged in Count 1 of the indictment. (*Id.* at R. 431).

On appeal, Petitioner raised the issue of denial of the motion for more definite statement. It was addressed by the Alabama Court of Criminal Appeals as follows:

> Ottie and Patricia also argue that the trial court committed reversible error when it denied their motions for a more definite statement. (Issue I on page 3 of Ottie's brief; Issue II on page 3 in Patricia's brief.)
>
> Both Ottie and Patricia entered pleas of "not guilty" to the charged offenses on October 18, 2001.  (C. 14 in CC-01-321; C. 15 in CC-01-322.)  On February 20, 2002, both Ottie and Patricia filed motions for a more definite statement. (C. 24 in CC-01-321; C. 16 in CC-01-322.)  Rule 13.2(e), Ala.R.Crim.P., states: "A motion for more definite statement may be made <u>at any time prior to entry of the defendant's plea,</u> which motion shall be granted for good cause shown." (Emphasis added.)  Ottie and Patricia did not file their motions for a more definite statement prior to the entry of their pleas; thus, they were not entitled to have their motions for a more definite statement of the charge granted.  *See Duncan,* 624 So.2d at 1088 ("While the appellant would have been, on timely motion, entitled to a more definite statement of the charge against her, she made no such motion 'prior to the entry of her plea.'  See Rule 13.2 (e), A.R.Crim.P.").

(Exhibit C at 6 (footnote omitted)).

Respondents assert that under Alabama law a motion for a more definite statement is waived unless timely entered. They cite various cases for this proposition. However, after

---

[2] All references in this Memorandum Opinion to the trial transcript are in the form "R.___."

a review of the cases cited, it is unclear whether motions for a more definite statement in those cases were filed at all, much less before the Petitioner entered a plea. Furthermore, the language of Rule 13.2(e) is permissive in nature. It states that a motion for a more definite statement *may* be entered at any time prior to the entry of the defendant's plea. As a general rule, a motion to produce is denied when, at the time the motion is filed, no proceeding is pending. *Cf. Hunt v. State*, 480 So.2d 61 (Ala.Crim.App. 1985); *Ex parte Wyatt*, 190 So.2d 924 (Ala.Crim.App. 1966). Based on this, the logical reason for this permissive language would seem to be that because a criminal prosecution does not commence until the defendant is arraigned or waives arraignment in writing in accordance with the Alabama Rules of Criminal Procedure, a motion of any sort prior to the initiation of prosecution would be premature. Thus, Rule 13.2(e) gives a defendant an opportunity to obtain information that he or she cannot otherwise possess prior to arraignment. A plain reading of the rule does not mandate the conclusion that a defendant *must* make this motion before arraignment, only that he or she *may* do so.

Nevertheless, the Alabama Court of Criminal Appeals interpreted this rule as requiring a pre-arraignment motion for a more definitive statement and there the matter would seem to rest, except for the fact that the state appellate court completely ignored the fact that the written waiver of arraignment reserved the right to file any motions which could have been filed prior thereto. This, presumably, would have included the only motion that *could* have been filed prior to arraignment–namely, a motion for more definite statement.

However, even assuming the right to make such a motion was appropriately reserved and that it was erroneous for the state appellate court to conclude that it was untimely, Petitioner is not necessarily entitled to relief. The purpose in requesting a motion for a more definite statement prior to arraignment is to allow the defendant sufficient information upon which to base a plea. Here, Petitioner chose to enter her plea without first obtaining more information.   Having done so, her reservation of a right to assert this motion post-arraignment is pointless. Since she had already entered her plea, she no longer needed this information for the purpose of deciding what kind of plea to enter. By voluntarily entering her plea without first seeking a more definite statement, Petitioner waived any objection that otherwise may have arisen by being forced to enter a plea without sufficient information concerning the charges.   She may have reserved the right to obtain this information post-arraignment; however, by entering her plea without it, she waived any constitutional objection related to the entry of the plea.

Petitioner's second ground for relief requires more discussion.   She asserts that the State was allowed to proceed to trial on a "completely general indictment" when her motion for a bill of particulars also was denied. (Doc. #1, Petition for Writ of Habeas Corpus, ¶ 6). This issue was raised prior to trial by motion (Exhibit A at 16) and in court prior to trial (Exhibit A at R. 4-10), as well as on appeal (Exhibit B, Brief of Appellant, at 35-36), but was never addressed by the Alabama Court of Criminal Appeals. Likewise, it was not addressed

by Respondents, though it was raised in Petitioner's petition. (Doc.#1, Petition for Writ of Habeas Corpus, ¶¶ 6-7).[3]

The Sixth Amendment guarantees every defendant the right to be informed of the government's accusation against him. *Russell v. United States*, 369 U.S. 749, 763 (1962). An indictment is sufficient to protect this right if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

> For an indictment to be valid, it must "contain [ ] the elements of the offense intended to be charged, and sufficiently apprise [ ] the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) (internal quotations omitted); *United States v. Sanchez*, 269 F.3d 1250, 1314 (11th Cir. 2001) (*en banc*), *cert. denied*, 535 U.S. 942, 122 S.Ct. 1327, 152 L.Ed.2d 234 (2002). "An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute." *Russell*, 369 U.S. at 765, 82 S.Ct. at 1047 (internal quotations and citations omitted). Furthermore, if the indictment tracks the language of the statute, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* at 765, 82 S.Ct. at 1048; *see also Hamling v.*

---

[3] The petition for a writ of habeas corpus filed in this case is inartfully drafted and, at times, confusing. However, the undersigned was able, without effort, to glean from paragraphs 6 and 7 of the petition the assertions that due process constitutional error resulted when Petitioner's motion for a bill of particulars or a more definite statement was denied. She clearly asserts error in the denial of both. (Issues 1 and 2). Only one is addressed. The same paragraphs also clearly raise as error the trial court's failure to instruct the jury so as to avoid a "generic prosecution" by the State. (Issue 3).

*United States*, 418 U.S. 87, 117-18, 94 S.Ct. 2887, 2907-08, 41 L.Ed.2d 590 (1974).

*United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003).

The count of conviction in Petitioner's indictment tracks the language of the applicable statute and states that Petitioner "did intentionally abuse or neglect a protected person, to wit: LOIS SMITH, and thereby caused serious physical injury to the said LOIS SMITH in violation of 38-9-7 of the Code of Alabama." The only time frame given for this offense is the allegation that it occurred "before the finding of this Indictment." Obviously, the offense alleged could not have occurred after the finding of the indictment so there is effectively no notice to Petitioner concerning when this crime is alleged to have occurred.

"Serious physical injury" is defined as "[p]hysical injury which creates a risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, protracted loss of the function of any bodily organ, or the impairment of the function of any bodily organ," § 38-9-2(21), *Ala. Code* (1977). However, the indictment fails to provide any information regarding whether the injury alleged was determined to be serious based on it being an injury that created a risk of death, caused serious and protracted disfigurement, protracted impairment of health, protracted loss of the function of a bodily organ or the impairment of a bodily organ.

Thus, while the indictment contained all of the elements of the offense charged, it did not, standing alone, fairly inform Petitioner of the charge against which she must defend. This could have been cured by a bill of particulars, but none was ever produced. However,

18

the court did enter a detailed discovery order. (Exhibit A at 24-25, Order for Discovery and Production). This order required the district attorney to allow the defendant to analyze, inspect, copy or photograph books, papers, documents, photographs, tangible objects, and other items which were material to the preparation of her defense. (*Id.* at ¶ C). The order also required the district attorney to permit the defendant access to the results or reports of physical or mental examinations. (*Id.* at ¶ D). The record does not reflect what evidence was provided pursuant to this order, but there were no motions to compel compliance with this order filed by either Petitioner or her husband/co-defendant.

The denial of a bill of particulars is not grounds for habeas relief absent a showing of clear abuse of discretion resulting in prejudice to the substantial rights of the accused. *Dillen v. Wainwright*, 449 F.2d 331 (5th Cir. 1971).[4] This is consistent with the general rule that the sound discretion of a trial judge in denying a motion for a bill of particulars will not be disturbed unless the court concludes that the defendant was actually surprised at trial and thus that his substantial rights were prejudiced by the denial. *United States v. Cole*, 755 F.2d 748, 761 (11th Cir. 1985).

At trial, the State introduced photographs of the inside of the house and of Lois Smith as she appeared when she was discovered by Susan DeShazer on April 24, 2001. (Exhibit A at R. 97-105). Attorneys for Petitioner and for Ottie Stokes did not object to their

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

introduction, nor did they claim surprise or allege a failure of the State to comply with the court's discovery order. The same is true with regard to pictures taken of Ms. Smith at the hospital after her removal from the Stokes' home. (*Id.* at R. 135-37).

The State called Dr. Paul Roller to testify concerning the physical and mental condition of Ms. Smith, including a description of the decubitus ulcer which he described as large and which he testified could, if left untreated, have led to her death. (*Id.* at R. 168, 171, 179). Dr. Roller was effectively cross-examined by Mr. Dawson regarding Ms. Smith's physical and mental condition. Most significant is the fact that Mr. Dawson questioned Dr. Roller using medical records from another of Ms. Smith's treating physicians, Dr. James Matic. (*Id.* at R. 195-200).

After the State rested, two medical witnesses, Dr. Milton Norrell and Dr. Matic, were called as witnesses for the defense and questioned regarding the causes and treatment of a decubitus ulcer and the physical and mental health of Ms. Smith and the effect of her condition on the cause, growth, and treatment of the ulcer. (*See id.* at R. 217-41, 241-59). During the course of the examination of Dr. Matic, more medical records regarding the treatment of Ms. Smith were introduced as evidence for the defendants.

Thus, it is clear that counsel for Petitioner and her co-defendant's counsel were sufficiently aware of the basis of the State's prosecution to enable them to present a defense. The defendants' attorneys were able to effectively cross-examine the medical expert presented by the State and expressed no surprise regarding the subject of his testimony.

Likewise, they were aware of the testimony the State intended to present well enough in advance of trial to successfully obtain the testimony of two more medical witnesses which they presented in an attempt to show that Ms. Smith's decubitus ulcer was not the result of purposeful or reckless actions taken by either defendant but were, rather, the result of her ongoing health problems and exacerbated by her incontinence and Alzheimer's disease. It is clear from the trial record that Petitioner was not surprised by the testimony presented at trial; thus, there was no prejudice to her. Therefore, even if Petitioner's constitutional right to due process was violated by the failure of the trial court to grant the motion for a bill of particulars, this action does not warrant habeas relief because it had no "substantial and injurious effect or influence" on the outcome of the case. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).

**Petitioner's Claim that the State was Permitted to Engage in a "Generic Prosecution"**.

Petitioner also objects to the failure of the trial court to delineate what the victim's alleged "serious physical injury" was. She asserts that this resulted in a "generic prosecution" where there existed a possibility that some jurors may have convicted Petitioner without agreeing on the same factual basis for the conviction. This issue was addressed on appeal and rejected by the Alabama Court of Criminal Appeals. That court held that Petitioner had waived this argument because she never requested the trial court to give a specific unanimity instruction to the jury at trial. (Exhibit C, Memorandum Opinion, at 7-9).

As a general rule, a federal court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are independent and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). In *Coleman*, the Supreme Court stated, in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 750.

To preserve error for consideration on appeal, Alabama law requires a timely objection stating specific grounds for the alleged harm. *Hutchinson v. State*, 516 So.2d 889 (Ala.Crim.App. 1987); *Smelcher v. Attorney General of Alabama*, 947 F.2d 1472, 1475 (11th Cir. 1991). Petitioner neglected to preserve any type of objection to the state trial court's failure to give a specific unanimity instruction to the jury. Consequently, the alleged error is procedurally barred unless Petitioner can prove cause for the default and actual prejudice resulting from it. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioner has not alleged or proved any cause or prejudice that would excuse her procedural default of this claim in state court.

**Petitioner's Claim that the State Failed to Prove the Victim, Lois Smith, Suffered a "Serious Physical Injury".**

Petitioner also alleges that the State failed to prove the victim, Lois Smith, suffered a "serious physical injury." The federal courts play a limited role in weighing the constitutional sufficiency of evidence in a state criminal prosecution. *See Martin v. State of Alabama*, 730 F.2d 721, 724 (11th Cir. 1984). The sole question to be determined when a state prisoner seeks federal habeas relief on the ground that the evidence at her trial was insufficient is "whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. White*, 815 F.2d 1401, 1403 (11th Cir.), *cert. denied*, 485 U.S. 863 (1987), *citing Jackson v. Virginia*, 443 U.S. 307, 320 (1979). "The government's proof need not rule out *every* theory except guilt beyond a reasonable doubt." *Bishop v. Kelso*, 914 F.2d 1468, 1470 (11th Cir. 1990).

When presented with conflicting testimony, a federal habeas court must presume that the trier of fact resolved the conflict in favor of the prosecution and against the defendant. *Machin v. Wainwright*, 758 F.2d 1431 (11th Cir. 1985). In other words, the federal courts must defer to the judgment of the jury in assessing the credibility of the witnesses and weighing the evidence. *See Jackson*, 443 U.S. at 326; *Wilcox v. Ford*, 813 F.2d 1140 (11th Cir. 1987).

The term "serious physical injury" is defined in § 38-9-2(12), *Ala. Code* (1977). It results when there occurs a "[p]hysical injury which creates a risk of death, or which causes

serious and protracted loss of the function of any bodily organ, or the impairment of the function of any bodily organ." The evidence at trial, excerpted from the opinion of the Alabama Court of Criminal Appeals memorandum opinion has already been quoted *supra*. After reviewing this evidence, the Alabama Court of Criminal Appeals found that there was sufficient evidence to submit this issue to the jury. (Exhibit C, Memorandum Opinion, at 13-14). It concluded that there was evidence that the bedsore could result in death if it were left untreated, that Petitioner and her co-defendant/husband were not taking steps to properly treat it, that Petitioner had denied a home healthcare nurse access to the victim, that the wound did not have a dressing on it, and that the victim was not positioned in a bed in a manner that would have kept pressure off of it in order to promote healing. (*Id.* at 14).

Petitioner's claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *Neelley v. Nagle*, 138 F.3d 917, 921 (11th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). Under the AEDPA, Congress included the statute enacted as 28 U.S.C. § 2254 (d), which states as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

This statute requires that a court first determine whether the federal law applicable to Petitioner's claim has been clearly established by the Supreme Court. *Neelley*, 138 F.3d at 924. Next, the court must determine if the state court's adjudication of the claim was contrary to established Supreme Court law. This can occur in two ways. The first would be when a state court faces a set of facts that is essentially the same as those the Supreme Court has faced earlier, but nevertheless reaches a conclusion different from the Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-07 (2000). The second situation is one in which a state court, in contravention of Supreme Court case law, fails to apply the correct legal principles to decide a case. Such a result would be "contrary" in the sense that the state court has not adjudicated the claim in the manner prescribed by the Supreme Court. *Id.* at 405-06. Both of these types of errors are errors of pure law; in the first case, a state court has denied a Petitioner a constitutional right defined by the Supreme Court in its role as interpreter of the Constitution, while in the second the state court has failed to apply the proper law to a case. *Neelley*, 138 F.3d at 923-24.

If a state court's decision is not contrary to the law as established by the Supreme Court, the habeas court must determine whether the law was applied in an unreasonable manner. A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct governing rule from the court's cases but unreasonably applies it to the facts of the case. An application is also unreasonable if the

state court either unreasonably extends a legal principle of Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should. *Williams*, 529 U.S. at 407-08. When making this determination, the state court decision must stand unless it is not debatable among reasonable jurists that the result of which the Petitioner complains is incorrect. *Neelley*, 138 F.3d at 924-25. The federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Under this analysis, an erroneous or incorrect application of Supreme Court law is not necessarily an "unreasonable application."

With respect to any findings of fact which bear on the state court's decision, the AEDPA gives the following direction:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). In summary, the decision of the state court is binding under § 2254(d) unless it resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

A review of the evidence outlined above reflects a correct application of the *Jackson* standard by the Alabama Court of Criminal Appeals which stated, "[t]he test used in determining the sufficiency of the evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." (Exhibit C, Memorandum Opinion, at 9 (citations omitted)).  Furthermore, Petitioner has failed to demonstrate that the court of appeals' decision was based upon an unreasonable determination of the facts in light of the evidence presented.  Therefore, this fourth claim is without merit.

**Petitioner's Claim that the State Failed to Establish a *Prima Facie* Case to Prove She Intentionally Abused or Neglected Lois Smith**.

Petitioner also alleges that the State failed to establish a *prima facie* case to prove she intentionally abused or neglected Lois Smith.  According to Petitioner, the trial court erred when it failed to grant a directed verdict of acquittal.  This matter was also addressed by the Alabama Court of Criminal Appeals which stated as follows:

> Section 38-9-2(1) defines "abuse" as the "willful deprivation by a caregiver . . . of services necessary to maintain mental and physical health."  As outlined in Part IV of this memorandum, there was sufficient evidence to support submitting to the jury the question of whether Ottie and Patricia's conduct -- in particular, their dismissal of the home health care nurse and their failure to provide the victim the necessary treatment to curtail the progression to her bedsore -- constituted abuse as defined in § 38-9-2(1).  Thus, Ottie and Patricia are not entitled to relief on this issue.

(Exhibit C, Memorandum Opinion, at 14-15).

The court of appeals' decision does not conflict with or constitute an unreasonable application of the *Jackson* sufficiency standard. The evidence showed that Lois Smith was "abused" in that she suffered "physical pain" from her decubitus ulcer and was "willfully deprived . . . of services necessary to maintain [her] mental and physical health" when Petitioner and her husband dismissed the home healthcare nurse and failed to provide the victim with the proper treatment necessary to avoid or treat her pneumonia, dehydration, and decubitus ulcer. Therefore, Petitioner's fifth claim is without merit.

### CONCLUSION

Based on the foregoing, the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is due to be denied. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** this ___7th___ day of September, 2004.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE